UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                   Case No. 20-20341

Creshaun McGee and                Sean F. Cox
Dwight Perry,                     United States District Court Judge

      Defendants.
_____/

## ORDER DENYING DEFENDANTS' MOTION TO SUPRESS

In this Criminal Case, Defendants Creshaun McGee ("McGee") and Dwight Perry ("Perry") are charged with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The matter is currently before Court on Defendants' Motion to Suppress all evidence obtained as a result of a traffic stop and search of the vehicle McGee was driving at the time of their arrest. The motions have been briefed and an in-person hearing was held on May 11, 2021 that continued via Zoom on May 12, 2021.[1]

## PROCEDURAL BACKGROUND

On August 5, 2020, a grand jury indicted McGee and Perry on one count each of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 17). On October 1, 2020, McGee filed this motion to suppress all evidence obtained from a traffic stop that occurred on February 17, 2020. (ECF No. 38). On October 8, 2020, Perry filed a notice of joinder in

---

[1] Hearings by Zoom video conference has become the norm since the start of the COVID-19 pandemic. See *In re Temporary Use of Video Conferencing, Telephone Conferencing, and Other Procedures in Criminal Matters Pursuant to the Coronavirus Aid, Relief, and Economic Security Act*, 21-AO-006 (March 26, 2021), http://www.mied.uscourts.gov/pdffiles/21AO006.pdf (authorizing video hearings until June 24, 2021 in light of COVID-19 risks).

McGee's motion, which this Court granted. (ECF No. 39). Defendants argue that the traffic stop and the search of the vehicle violated the Fourth Amendment. (Def's Br. ECF No. 38 at PageID 153). The Government responded. (ECF No. 46). The Court held an in-person evidentiary hearing on May 11, 2021 and continued via Zoom on May 12, 2021.

At the hearing, the Government called five witnesses: (1) Detroit Police Officer Kenneth Valrie, (2) Detroit Police Officer Mohamed Barakat, (3) Detroit Police Officer Ronald Hopp, (4) Detroit Police Officer Evan Humes, and (5) Former Detroit Police Officer Angel Bermudez.

The Government also entered four exhibits: Detroit Police Department Body Camera Video of Officer Ronald Hopp (Exhibit 3), Detroit Police Department Body Camera Video of Stephen Petroff (Exhibit 4); the Facebook Live Video from Officer Kenneth Valrie's desktop and shared over text message with the Gang Intelligence Unit officers (Exhibit 6); and the Register of Action 36th District Court (Exhibit 7).

On May 11, 2021, after hearing the testimony from Officer Hopp, Officer Barakat, and Officer Valrie, Defendants filed supplemental motions arguing that the traffic stop violated M.C.L. § 257.742. (ECF Nos. 75, 76). The Government responded arguing that the officers were still justified in conducting the traffic stop. (ECF No. 78).

Now, having heard and observed the witnesses who testified at the evidentiary hearing, allowing for the Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing legal principles, the Court makes the following findings of fact and conclusions of law.[2]

## FINDINGS OF FACT

---

[2] To the extent that a finding of fact is more properly a conclusion of law, and to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

On February 17, 2020, at some time between 12 p.m. and 12:30 p.m., Detroit Police Officer Kenneth Valrie ("Valrie") of the Gang Intelligence Unit was monitoring a Facebook Live video of the user "Humble Trapper," which was known to belong to Perry, who was a known member of the CHEDDA gang.

On the video, Valrie observed two men driving around armed with an apparent AK-47 style rifle and smoking marijuana. In the video, the driver of the vehicle was wearing an L.A. Lakers' jacket with a hood, and the passenger had short dreadlocks. Valrie showed the video to other police officers in the office, including Officers Angel Bermudez ("Bermudez"), Ronald Hopp ("Hopp"), Stephen Petroff ("Petroff"), Evan Humes ("Humes"), Philip Rodriguez ("Rodriguez"), and Mohamed Barakat ("Barakat"). Bermudez recognized the passenger in the video as Perry because he had previously investigated Perry. From that prior investigation, Bermudez knew Perry to be a convicted felon.

The video shows McGee driving with Perry in the passenger seat. The Defendants are seen passing the firearm between the two of them, smoking marijuana, and singing along to music. In the video, both Defendants hold and manipulate the rifle at various times. At one point, McGee points the rifle to the camera and mimics shooting. At another, Perry brandishes the rifle pointing it towards the roof of the car. In the video, a Chevy insignia can be seen on the steering wheel as well as a variety of homes and streets in an industrial neighborhood in the east side of Detroit.

After watching a portion of the video, several officers left the office in order to find the Defendants. Barakat and Rodriguez changed into plain clothes and went out together in an unmarked car to work undercover. Bermudez, Hopp, Petroff, and Humes were in their uniforms and left together in a marked police vehicle. Valrie remained at the office to continue monitoring

the Facebook Live video. Valrie made a recording of the Facebook Live video and sent it on to the other officers from his cell phone.

Rodriguez and Barakat were working undercover when they saw two men matching the individuals on the Facebook Live video driving around in a white Chevy Traverse. Barakat drove alongside the Traverse to confirm that the two men were the individuals in the Facebook Live video. After looking into the front seat and seeing the two individuals in the vehicle, Barakat confirmed that they looked like the same individuals in the video. He recognized McGee by the Lakers' jacket and Perry by his short dreadlocks. Barakat also noted the license plate number.

Using his binoculars, Barakat observed the Traverse park near Celestine and Mayfield, and saw the two men exit the vehicle and saw them reenter the vehicle.

Barakat then observed McGee reenter the roadway failing to use his left-hand turn signal, which is a civil infraction in violation of M.C.L. § 257.648. Barakat then advised the marked units of McGee's traffic violation. Barakat did not initiate the traffic stop because he was in an unmarked vehicle and not in his police uniform.

Hopp, Petroff, Humes, and Bermudez were together in a marked scout car. They followed Defendants for a short while and called dispatch for other units to assist prior to making the stop because McGee and Perry were believed to be armed with an assault weapon. Eventually, they effectuated a traffic stop at the intersection of Outer Drive and Gratiot. There were four individuals in the vehicle: McGee was in the front driver seat; the female owner of the car was in the front passenger seat, Perry was in the left passenger seat behind McGee, and a woman was in the right rear passenger seat.

The following events all took place within the first two minutes of the traffic stop. Each of the four officers spoke to one of the four occupants of the vehicle. Bermudez spoke with the front

female passenger who told him that she had a concealed pistol license and that her weapon was in the trunk. Humes questioned McGee who stated that he lost his identification. Humes had McGee exit the vehicle and arrested him.

Hopp questioned and checked the pockets of the rear female passenger for weapons, and then searched the vehicle for the firearm identified by the front female passenger, locating it in a rifle bag that was in the third-row seat of the SUV in the passenger compartment. The footage from Petroff's body camera showed that while Petroff was questioning Perry, Perry was not yet secured when Hopp recovered the firearm. As Perry was unsecured in the second-row passenger seat, the firearm in the third-row seat was within Perry's reach before Hopp recovered it. The firearm was recovered within the first two minutes of the traffic stop. The firearm was later identified as a black Century Arms RAS47 7.62 x 33mm rifle.

Perry was known to the officers to be a convicted felon, and both Perry and McGee admitted on the scene that they were convicted felons.

McGee was arrested for failing to produce his driver's license, for being a felon in possession of a firearm, and for multiple traffic warrants. Perry was arrested for felon in possession of a firearm and for multiple traffic warrants. The front seat passenger had outstanding traffic warrants, so she was also arrested.

As the only remaining occupant was not the owner of the vehicle, nor was she offered at the scene as an alternative driver, the vehicle was towed and impounded in accordance with Detroit Police Department Impound Procedures.

## CONCLUSIONS OF LAW

Defendants argue that the traffic stop and the search of the vehicle violated the Fourth Amendment and that all evidence obtained during the search should be suppressed. Regarding the

5

traffic stop, the Government responds that the stop was lawful because the officers had a

reasonable suspicion that McGee and Perry were felons in possession of a firearm and they had

probable cause to believe that a traffic violation had occurred. Regarding the search of the vehicle,

the Government also argues that it was lawful under the following exceptions the Fourth

Amendment warrant requirement: (a) a protective search under *Michigan v. Long*, 463 U.S. 1032

(1983), (b) the automobile exception, (c) the search incident to an arrest exception, and (d) the

inevitable discovery exception.

## I. The Traffic Stop

The traffic stop was lawful because the officers had reasonable suspicion that Perry had

committed a crime or that a crime was ongoing and because the officers had probable cause to

believe McGee had committed a traffic violation.

## A. Reasonable Suspicion of a Felony

The police may pull a vehicle over where they have a reasonable suspicion that a crime is

ongoing or that a felony has already occurred. *United States v. Jones*, 953 F.3d 433, 436 (6th Cir.

2020). As the Sixth Circuit explained:

> The Fourth Amendment protects "[t]he right of the people to be secure in
> their persons, houses, papers, and effects, against unreasonable searches and
> seizures." U.S. Const. amend. IV. When an officer stops a vehicle and questions
> the occupants, even for a brief moment, that counts as a "seizure" of
> "persons." *Whren v. United States*, 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d
> 89 (1996). Officers may conduct these stops if, among other justifications, "specific
> and articulable facts," *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889
> (1968), support a reasonable suspicion that the car's "occupants are involved in
> criminal activity," *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83
> L.Ed.2d 604 (1985). But what happens if the officer stops a vehicle to investigate
> criminal activity that already occurred? We know the answer in part. If the activity
> qualifies as a felony, the Fourth Amendment does not bar the stop. *Id.* at 229, 105
> S.Ct. 675.

*Id*. at 435-436.

Here, the Facebook Live video shows McGee and Perry brandishing an AK rifle-style semiautomatic pistol while driving and smoking marijuana. The officers had reasonable suspicion that Perry was a felon in possession of a firearm because Bermudez recognized Perry in the Facebook Live video and knew him to be a convicted felon. Prior to the traffic stop, Barakat and Rodriguez confirmed the individuals in the white Chevy Traverse matched the identities of those in the video based on their clothes and hair.

The Court finds the officers had reasonable suspicion that Perry was a felon in possession of a firearm at the time they conducted the stop. The Court, therefore, finds that the traffic stop was lawful.

**B. Reasonable Suspicion of a Traffic Violation**

The police may also pull over a vehicle when they have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). While in his unmarked, undercover vehicle, Barakat observed McGee enter the roadway without using his left turn signal in violation of M.C.L. § 257.648. Then he alerted the officers in the marked police vehicle via radio of McGee's traffic violation. The Government argues that this is sufficient to establish that the officers in the marked vehicle had probable cause of a traffic violation. (ECF No. 46 at PageID 200).

At the hearing, Hopp testified that while he was the one who conducted the traffic stop and wrote the ticket for failure to signal, he did not see the traffic violation, nor did he have Barakat return to the scene to sign the ticket. In their supplemental motions, Defendants argue that this is in violation of M.C.L. § 257.742. However, as noted by the Government, the Sixth Circuit has clearly held that "[i]t is well established that an officer may conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765-766 (6th Cir. 2012).

Furthermore, Michigan recognizes the "police team" theory, which permits "officers who are working together on a case to combine their collective perceptions so that if the composite otherwise satisfies the presence requirement that requirement is deemed satisfied although the arresting officer does not himself witness all the elements of the offense." *People v. Dixon*, 392 Mich. 691, 698 (1974) (abrogated in part on other grounds *People v. Hawkins*, 468 Mich. 488 (2003)). The Sixth Circuit and Michigan caselaw make it clear that an officer may rely upon information provided by a fellow officer to conduct a traffic stop, issue a citation, or make an arrest.

The Court finds that the officers had probable cause that a traffic violation occurred and therefore the stop was lawful.

## II. Search of Vehicle

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Here, the Government argues that the search of the vehicle without a warrant was lawful under the Fourth Amendment and the firearm is admissible pursuant to (a) a protective search under *Michigan v. Long*, 463 U.S. 1032 (1983), (b) the automobile exception, and (c) the search incident to an arrest exception, and (d) the inevitable discovery exception. The Court agrees and finds that the search was lawful under all four theories.

## A. Protective Search

In *Michigan v. Long*, the Supreme Court held that:

The search of the passenger compartment of an automobile limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts, which taken together with the rational inferences from those facts, reasonably warrant the

8

officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

463 U.S. at 1049-1050 (quotations removed). Whether a reasonable suspicion of danger existed is "determined from examination of the individual factors under the totality of circumstances." *U.S. v. McCraney*, 674 F.3d 614, 620 (6th Cir. 2012). A search based on reasonable suspicion is permissible "even if the suspect is detained outside the vehicle because if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside." *Id*. (citations removed).

Here, the Government argues that this was an "extremely tense volatile situation where officers were responding to a scene where two males were known to have been brandishing a high-powered assault rifle while driving around in a vehicle shortly before the traffic stop." (ECF No. 46 at PageID 201). When the officers stopped the car, the female passenger in the front seat admitted there was a firearm in the vehicle. The officers testified that the AK-style rifle they observed in the Facebook Live video was far more powerful than the weapons they carry and that their protective vests would not be effective against such a strong firearm. The search of the vehicle occurred at the same time McGee and Perry were questioned and before Perry was secured.

The Court finds that the search was lawful as a protective search under *Michigan v. Long* because the officers possessed a reasonable belief that Defendants were dangerous and might have been able to gain immediate control of the apparent AK-style rifle seen in the Facebook Live video while they were not yet under arrest.

## B. The Automobile Exception

Under the automobile exception, an officer may "perform a warrantless search of a detained vehicle should the officer have probable cause to believe the vehicle contains contraband or evidence of criminal activity." *United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020)

(quoting *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (citations omitted).

Here, the officers had such probable cause to search the entire white Chevy Traverse because the Facebook Live video showed Perry – who was known to Bermudez as a convicted felon – in a vehicle with a Chevy insignia on the steering wheel and brandishing an AK-47 style rifle. While searching for the men in the video, Barakat pulled alongside the white Chevy Traverse and recognized McGee and Perry from their distinctive clothes and hairstyles. Barakat then informed the officers in the marked police vehicle of the license plate number and the make and model of the car that McGee was driving. The vehicle details provided by Barakat matched the observations Valrie made while watching the Facebook Live video when he saw the Chevy insignia on the steering wheel. It was reasonable for the officers to believe that the AK-47 style rifle that McGee and Perry were seen brandishing in the Facebook Live video was likely still in the white Chevy Traverse.

Defendants argue – without citing any authority to support to support their argument – that the probable cause expired because of the amount of time that transpired between when the Valrie watched the video and the time when the officers conducted the stop. (Def's Br. at PageID 153). The Court finds this argument unpersuasive. A felon in possession of a firearm offense is an ongoing or continuous offense. *United States v. Goodwin*, 552 F. App'x 541, 544-545 (6th Cir. 2014). The Sixth Circuit has held that with a continuing offense the passage of time is less significant. *Goodwin*, 552 F. App'x at 480 ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Valrie and the other officers started watching the Facebook Live

video sometime between 12 p.m. or 12:30 p.m. The traffic stop occurred shortly before 3:20 p.m., which was when Hopp wrote the ticket for failure to signal on turn or leaving a curb. This is only a period of a few hours, at best, between when the officers watched the video and when they initiated the stop. As a felon in possession of a firearm offense is an ongoing offense, the Court finds that the officers still had probable cause when they effectuated the traffic stop and searched the vehicle.

The Court finds that the officers had probable cause to believe that the vehicle contained the AK-style rifle seen in the Facebook Live video, which is evidence of McGee and Perry's felon in possession of a firearm offense. Therefore, the search was lawful under the automobile exception to the Fourth Amendment's warrant requirement.

## C. Search Incident to an Arrest

A search incident to an arrest is an exception to the warrant requirement derived "from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). "Police may search incident to arrest only the space within an arrestee's 'immediate control,' meaning "the area from within which he might gain possession of a weapon or destructible evidence."" *Id*. at 335 (citing *Chimel v. California*, 395 U.S. 752, 763 (1969)). Police may also search the vehicle "when it is reasonable to believe that evidence of arrest might be found in the vehicle." *Id*. The Court agrees with the Government that both circumstances are present in this case.

The Court finds that the firearm was in the Defendants' "immediate control," that at the time of the search. McGee was immediately next to the vehicle at the time of the search and was in the process of being detained by Humes, but McGee was not yet under arrest at the time the firearm was recovered. From his position immediately next to the vehicle, McGee could have

11

accessed the firearm which was on the third row seat of the Traverse. The footage from Petroff's body camera showed that Perry was unsecured at the time Hopp recovered the firearm. Perry was in the second row of passenger seats in close proximity to the firearm, which was on the third row seat. Perry could have easily reached behind him accessed the firearm as it was within his arm's reach. McGee and Perry were unsecured and within reaching distance of the passenger compartment at the time of the search and thus, the gun was in their "immediate control" under *Chimel*. *Id*. at 335.

From the body camera footage, it appears the McGee and Perry's arrests occurred nearly simultaneously as Hopp searched the vehicle for the firearm. But it doesn't matter whether the search took place before or after the arrest, because the Sixth Circuit has held a formal custodial arrest need not precede the search as long as the formal arrest follows "quickly on the heels of the challenged search" and "the fruits of that search are not necessary to sustain probable cause to arrest." *United States v. Latham*, 763 F. App'x 428, 431 (6th Cir. 2019).

Regarding whether it was reasonable for the officers to believe that evidence of the arrest might be found in the vehicle, the Court finds the officers' belief was reasonable Perry was known to the officers as a convicted felon and the Facebook Live video showed that he was in possession of a firearm only a few hours prior to the search. Additionally, the female passenger admitted that the firearm was inside the vehicle prior to the search, and therefore the officers knew that there was a firearm inside the vehicle as they began their search.

Therefore, the search of the vehicle was lawful under the search incident to arrest exception under the Fourth Amendment's warrant requirement.

**D. Inevitable Discovery**

"The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kimes*, 246 F.3d 800, 804 (6th Cir. 2001) (quoting *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995)). Proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . ." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "Proof that contraband would have been detected in "an inventory search that would inevitably follow seizure of a car" is sufficient to invoke the inevitable discovery exception to the exclusionary rule." *Kimes*, 246 F.3d at 804 (citing *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995).

Here, even if the officers had not searched the vehicle at the time of arrest, the firearm would have been inevitably found later. The officers impounded the vehicle, and the Detroit Police Department's policy requires an inventory search of vehicles before they are towed and impounded. Three of the four occupants of the vehicle were arrested. Defendants argue that the fourth occupant could have potentially driven the vehicle home and implies that the decision to impound the vehicle was unreasonable because no inquiry was performed at the scene. (Def's Br. at PageID 154). The Government counters and says that while the Detroit Police Department's policy allows the officer discretion to allow a properly licensed driver to take possession of the vehicle but there is no requirement that they do so. (Gov's Br. at PageID 208). Furthermore, the fourth occupant was never offered as an alternative driver at the scene. (Gov's Br. at PageID 209). The Government argues that "the impoundment of the vehicle was reasonable because the vehicle was obstructing traffic, and if left on the side of the roadway, the car could have been stolen,

vandalized, or hit by another vehicle" and because there was "reasonable cause to believe that the

vehicle was used in the commission of a crime." (Gov's Br. at PageID 209).

The Court agrees with the Government. The officers reasonably exercised their discretion

to impound the vehicle in accordance with Detroit Police Department Impound Procedures, and

the firearm would have inevitably found in an inventory search before the vehicle was towed and

impounded. Therefore, the search was lawful under the inevitable discovery exception to the

Fourth Amendment's warrant requirement.

## CONCLUSION

For the reasons described above, the Court finds that both the traffic stop and the search of

the vehicle were lawful. Therefore, the Court DENIES Defendants' motion to suppress.

**IT IS SO ORDERED**.

Dated: May 25, 2021                           s/Sean F. Cox
                                              Sean F. Cox
                                              U. S. District Judge